## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PANAMA CITY DIVISION

**KELWYN WHITE,**                    **CASE NO.  5:23-cv-00257-AW/MJF**

      **Plaintiff,**

**v.**

**LOUIS DEJOY, POSTMASTER**
**GENERAL OF UNITED STATES**
**POSTAL SERVICE,**

      **Defendant.**

_____/

## SECOND AMENDED COMPLAINT

Plaintiff, KELWYN WHITE, hereby sues Defendant, LOUIS DEJOY

POSTMASTER GENERAL, UNITED STATES POSTAL SERVICE, and alleges:

## JURISDICTION

1.    This is an action brought under Title VII of the Civil Rights Act of

1964, codified at 42 U.S.C. §2000e et seq. and 42 U.S.C. §1981a. Attorneys' fees

and costs are also sought under 28 U.S.C. §2412.

2.    This action involves claims which are, individually, in excess of

Seventy Five Thousand Dollars ($75,000.00), exclusive of costs and interest.

## THE PARTIES

3.    At all times pertinent hereto, Plaintiff, KELWYN WHITE has been a

resident of the Northern District of Florida and was employed by Defendant.

Plaintiff is a member of a protected class due to his race and due to his reports of discrimination and was the victim of retaliation thereafter.

4.     At all times pertinent hereto, Defendant, UNITED STATES POSTAL SERVICE, has been organized and existing under the laws of the State of Florida. At all times pertinent to this action, Defendant has been an "employer" as that term is used under the applicable laws identified above. Defendant was Plaintiff's employer as it relates to these claims.

## CONDITIONS PRECEDENT

5.     Plaintiff has satisfied all conditions precedent to bringing this action, if any.

## STATEMENT OF THE ULTIMATE FACTS

6.     Plaintiff, an African American male, began his employment with Defendant on or about July 21, 2021, and was fired due to ongoing race discrimination and retaliation on July 11, 2023.   He was reinstated in September 8, 2023, pursuant to a union grievance.

7.     Between July 2021 and March 2022, Plaintiff rotated between stations, working for a number of stations in North Florida with no discipline.

8.     As of March 2022, Plaintiff was placed at Defendant's facility located at 5360 Cliff Street, Graceville, Florida 32440 on a part time basis.  A white female, Terra Roberts, was the acting Station Manager at that time and she hired

2

Plaintiff part time at the Graceville location as of March 25, 2022 although he was working full time hours.

9.      Ms. Roberts left that facility as acting Station Manager and transferred to another location at which time Travis Robarge, a white male, returned to the position of Station Manager around June 2022 in Graceville after he was on a temporary assignment as acting Station Manager at the Defendant's Greenwood location.  There was an overlap of at least a few weeks between Roberts leaving Graceville and Robarge returning to Graceville.

10.      Plaintiff's problems began with Defendant upon Robarge's return to Graceville.

11.      Despite his stellar work performance during his employment with Defendant,  Plaintiff was subjected to disparate treatment, different terms and conditions of employment, and held to a different standard because of his race and he has been the victim of retaliation after reporting race discrimination.

12.      The disparate treatment and retaliation came at the hands of specifically but not limited to Postmaster Travis Robarge, a white male and Supervisor Terra Roberts, a white female.

13.      Plaintiff is a loyal and dedicated employee, who has worked at several of Defendant's facilities. Plaintiff had a clean performance record with no prior

issues or reprimands until Robarge resumed his position as Station Manager in Graceville in June 2022.

14.     Plaintiff was the only African American employee at Defendant's Graceville location until around May 2024, when another African American employee was hired at that location as a rural carrier.  During Plaintiff's employment, he has been the only African American mail city carrier. Plaintiff was the only African American employee to work at the Graceville location ever until this second African American employee began working there in May 2024.

15.     On or around June 3, 2022, Plaintiff witnessed inappropriate and potentially threatening comments made by his white co-workers relating to politics, guns, and "special bullets to kill." Plaintiff immediately reported this conversation to Roberts and to the workers union associated with Defendant, however, no corrective actions were taken.

16.     On or around June 10, 2022, Plaintiff was given an unsatisfactory review by Robarge during an undercover evaluation. This evaluation was delivered to Plaintiff by Roberts as she appeared to still be the acting Station Manager in Graceville but Robarge was in the process of resuming his position in Graceville as the Station Manager.

17.     Specifically, Plaintiff received inaccurate information from Roberts, which was created by Robarge, which suggested that Plaintiff was not doing his

job.  Specifically, Robarge had followed Plaintiff in the June 2022 time period and created a false report about Plaintiff's driving practices accusing him of not driving properly and other violations of Defendant's policy.

18.    At the time of the unsatisfactory review, Plaintiff had never been introduced to Robarge.  Defendant's policy required that if there was going to be a route review, the supervisor had to give advance notice, which did not occur when Robarge was secretly watching and grading Plaintiff's performance.  Plaintiff only knew Robarge as someone who would watch him from afar, on multiple occasions, while Plaintiff was conducting work duties. On one occasion, Robarge entered the Graceville location to speak with Roberts but did not introduce himself to Plaintiff. Plaintiff reported that Robarge was watching him to the union president who addressed this with Robarge, advising him that he was not to be following Plaintiff around per Defendant's policies.

19.    Subsequently, Plaintiff discovered through the worker's union associated with the Defendant that the information created by Robarge in the unsatisfactory review about Plaintiff was false. The white carriers at the Graceville location not only were not followed secretly by Robarge but they did not have false information made up about them and put into an unsatisfactory review.

20.     In contrast to Robarge's review procedure, Plaintiff had received ample notice about impending reviews during his tenure at previous facility locations.

21.     Later in June 2022, Plaintiff received a call from Roberts, instructing him to promptly return to the Defendant's station. Upon arrival, Plaintiff was greeted by Roberts, who was accompanied by Law Enforcement Officer Shane Williams, a white male, who was with the Graceville Police Department.

22.     Officer Williams proceeded to read Miranda rights to Plaintiff, after which Plaintiff was escorted into the Station Manager's office alone with Officer Williams.

23.     Plaintiff was then interrogated about a package that he delivered three days prior but informed that he was not a suspect.

24.     According to Defendant's policy and procedures, the Inspector General for the Defendant should have been called to investigate rather than local law enforcement per Defendant's policy. No white employee of Defendant had been read their Miranda rights and interrogated about packages during Plaintiff's employment. In fact, Roberts and Clerk Cassandra White, a white female, handled the package prior to Plaintiff but were only questioned, and not read their Miranda rights. Robarge later confirmed that proper procedure was not followed on this occasion.

25.    On or around July 18, 2022, Robarge called Plaintiff to his office to apologize for his actions on the day that Plaintiff was issued an unsatisfactory review, in which he did not properly identify himself, harassed Plaintiff as he was conducting work duties, and followed Plaintiff to his drop off points. It was only at this point, four months after Plaintiff's transfer, that Robarge provided Plaintiff with his contact information.

26.    In July 2022, Plaintiff had the opportunity to have his pay direct deposited by Defendant. However, he opted not to and instead chose to receive paper checks.

27.    From August to November 2022, several of Plaintiff's paychecks were unreasonably delayed anywhere from three days to six weeks, and on at least one occasion, Plaintiff was paid by money order. Robarge attributed the delay to the fact that Plaintiff was the sole employee receiving payment via paper checks, although Plaintiff had previously witnessed other employees, who were white, receiving paper checks. None of the white employees had comparable payment issues or delays in being paid.

28.    On at least three occasions in August 2022, Plaintiff's work ethic was overly scrutinized, when compared to his white co-workers, and he was unreasonably targeted with questions that were not asked of similarly situated white co-workers.  Specifically, Robarge questioned Plaintiff extensively about his breaks,

where he took his breaks, the length of his breaks, the length of time it took to load his truck, the amount of time that Plaintiff was in the station and the length of time he took on his stops.  Robarge, in general, was overly critical of Plaintiff's work for no legitimate reason.  Plaintiff never saw or heard his white coworkers questioned like he was questioned and harassed by Robarge as stated in this paragraph.

29.    In or around August 2022, Graceville hired a white employee as a full time City Carrier, whereas Plaintiff was hired only part-time and had been seeking full time employment with Defendant since he started working in Graceville. Despite having worked full-time hours prior to this new person being hired, Plaintiff's hours were significantly reduced thereafter. Specifically, Plaintiff was only on the schedule to work on Saturdays when the white employee requested time off.

30.    Not long after the white employee began working at the Graceville location, she observed the disparate treatment from Robarge towards Plaintiff and advised Plaintiff to transfer to a different facility.

31.    Thereafter, in or around September 2022, Plaintiff began commuting to a neighboring post office located in Quincy, Florida, to assist in conducting mail carrier duties as there was a shortage of employees at that location. Plaintiff was still employed by the Graceville facility as his home location.

32.     While conducting work at the Quincy facility, Robarge called the on-duty Postmaster and required that she check in with him in regard to Plaintiff's work at that location. The Quincy Postmaster told Plaintiff that Robarge was very controlling and that she needed to call him first before scheduling Plaintiff to work there. Not long after that, Plaintiff was instructed by Robarge to begin conducting work in Bonifay, Florida, after which his work hours were reduced to three hours a day.  In Quincy, Plaintiff was working eight hours a day plus mileage.  Robarge required Plaintiff to leave Quincy to go to Bonifay where his hours were reduced and he received no mileage.  Regarding his mileage while he worked at Quincy, Robarge also restricted Plaintiff from access to a computer so that Plaintiff could not claim his mileage, which he did not do to white employees, and then refused to submit Plaintiff's mileage for weeks on end.

33.     On September 22, 2022, Plaintiff was issued a Letter of Warning for purportedly not following instructions by Robarge telling Plaintiff to go to another post office, Bonifay.  Notably, these instructions were texted to Plaintiff's personal cellphone after he had blocked Robarge from contacting him due to harassing and demanding messages. Robarge had the same capability to communicate these instructions to Plaintiff either through an office phone call or by sending an email to Plaintiff's work account after seeing that his messages were not "delivered." Plaintiff

was not required to maintain communication with Robarge through his personal cell phone.

34.     Plaintiff was issued this Letter of Warning notwithstanding the fact that Robarge knew that Plaintiff did not receive the instruction as the message showed Robarge that the message was not delivered.  No white employee was ever treated like this by Robarge.

35.     Plaintiff then contacted his union representative, London Kelly, to advise of the Letter of Warning.  Kelly previously worked with Robarge and stated that he is an "a___hole," and has "gotten worse." Nonetheless, Plaintiff was made to accept the Letter of Warning even though he provided documentation which confirmed that he did not receive that message from Robarge. Consequently, as a result of the Letter of Warning, Plaintiff was placed on a six-month probationary period, in which the Letter of Warning would be removed from his file if no further discipline occurred. After the six months, a review would be conducted to monitor Plaintiff's progress.

36.     That same day, Plaintiff's request for computer access was again denied by Robarge, whereas white employees were granted access. Plaintiff's primary reason for using Defendant's computer and database was to record the mileage he accrued during his commute to other facilities. Failing to record this information would result in Plaintiff not receiving compensation for his commuting time.

Plaintiff was granted this access while employed at other facilities but not Graceville, and none of his white co-workers were denied access as Plaintiff was.

37.    On October 3, 2022, and December 14, 2022, Plaintiff's request for leave time was unreasonably denied. On at least one of these occasions, Robarge balled up Plaintiff's paperwork containing his request and gave it back to him. Robarge claimed that Plaintiff's requests were denied due to a "need for service." However, a need for service only applies to an employee's home installation, and Graceville already had a primary carrier on schedule. Plaintiff volunteered at the other locations that he commuted to and was not required to maintain a schedule. Thus, Plaintiff was denied the ability to take time off while he was working at other facilities by Robarge, which time off and work Robarge had to approve because Plaintiff's home facility was the Graceville facility. White employees at the Graceville location were not denied leave time like Plaintiff was.

38.    In November 2022, Plaintiff reported his concerns of racial discrimination to the Union President and Steward.  Plaintiff was told by the Union Steward that she told Robarge about Plaintiff's complaints.

39.    On November 27, 2022, Plaintiff filed his first informal EEO complaint within Defendant, the formal complaint being filed January 5, 2023.

40.    Shortly after the filing of his informal complaint, Plaintiff was denied the opportunity of working holiday hours at the Graceville station, despite their

being a true need for service. During this peak season, Plaintiff was forced to commute to neighboring facilities for work. Plaintiff later learned that his white co-workers at the Graceville station, including white rural carriers who were in a different craft than city carriers, were allowed to work through holiday season depriving Plaintiff of hours at his home station.  In fact, one white rural carrier told Plaintiff that he was actually delivering packages on Plaintiff's route.

41.    On January 7, 2023, Robarge scheduled Plaintiff for a 7:45 am shift, but failed to notify him in advance.  Plaintiff learned of this shift from the clerk at the Graceville station and he arrived at least an hour late for this shift as a result.

42.    Shortly thereafter, Plaintiff reported his concerns of racial discrimination and retaliation to Defendant for a second time.  Plaintiff specifically told Robarge when he was at the Graceville station that Plaintiff was being treated differently than the white employees and that the way he was being treated was discriminatory and unfair.

43.    Later that month, Plaintiff began commuting to Panama City, Florida, to work, while still employed at the Graceville location.  He was working in Panama City on a volunteer basis.

44.    After Robarge learned that Plaintiff was working in Panama City, he told the Postmaster there to place Plaintiff on the schedule there.

45.     On February 24, 2023, Plaintiff was presented with paperwork by Robarge to sign which accused him of not being present at work during a scheduled shift in Panama City, which Plaintiff did not even know about. However, unless Plaintiff volunteered for the shift in Panama City, he could not be scheduled to work there.   Per Defendant's policies and procedures, an employee cannot be forced to commute more than 50 miles for a shift- which Robarge said that Plaintiff was being required to do. Furthermore, Plaintiff did not receive proper notice of these alleged shifts.

46.     Defendant thereafter classified Plaintiff as an absent without official leave "AWOL" employee. Robarge later falsely stated, on or around March 20, 2023, that Plaintiff had not been scheduled to work at any other locations.

47.     Plaintiff continued to supplement his EEO filings with additional acts of racial discrimination and retaliation occurring after his original filings to include all incidents and events occurring thereafter.

48.     On March 31, 2023, Plaintiff's father was diagnosed with a serious medical condition. Plaintiff immediately informed Defendant.

49.     On June 12, 2023, Plaintiff was approved for FMLA, which would end on October 2, 2023. Robarge received notification of this approval prior to Plaintiff, as such information is communicated to supervisors first.

50.     A white female clerk employee at the Graceville location had taken FMLA after going missing from work and due to this, Plaintiff believed his employment would not be terminated if he took FMLA protected leave. Notably, this employee's husband worked for Defendant and initiated the FMLA on her behalf.

51.     The following day after Plaintiff was approved for FMLA, Robarge contacted Plaintiff to ask him to come into work because the white employee who was working the shifts that Plaintiff previously worked had requested days off from work. Plaintiff reminded Robarge of his FMLA status and kindly denied the request. Robarge agreed that he would do the same thing if he were in a similar situation, and told Plaintiff that it was "fine" if he did not come in.

52.     On or around June 25, 2023, Plaintiff received notification via email that he was being considered AWOL and needed to respond within five days.  The allegation was that Plaintiff did not come into work around June 13, 2023 as discussed in paragraph 51 above because he was on FMLA leave.  White employees were allowed to take days off with immunity.

53.     The investigative interview for Plaintiff's AWOL status had been scheduled on June 24, 2023 but Plaintiff was tending to his sick father at this time and did not check the mail to know about the scheduled interview as he was not expecting documents from Defendant while he was on FMLA leave.

54.     After Plaintiff received the June 25, 2023 email, he texted Robarge on June 26, 2023, regarding his AWOL status but did not receive a response. Plaintiff then escalated the issue to Robarge's supervisors, who stated that Plaintiff would be contacted by the supervisor but never was.

55.     On July 15, 2023, Plaintiff received a Notice of Removal and was terminated for his alleged failure to maintain a regular work schedule. The white female clerk was treated more favorably and not was accused of being AWOL when she was out of work pursuant to her FMLA status.

56.     Plaintiff contested his termination through the union.  During Step A of the grievance process, Robarge refused to reinstate Plaintiff and to remove the reprimand and removal from his record. Plaintiff challenged this decision again through Step B of the grievance process. The same information presented to Robarge was also shared with higher-level supervisors in Step B, after which Plaintiff was reinstated in his position but he was not relocated to a different facility.  Plaintiff's reinstatement date was on or around September 16, 2023.  He has not been compensated for any of his backpay from the date of his removal to his date of reinstatement.

57.     Plaintiff is currently working at the Graceville location and has resumed working at neighboring facilities.  Robarge is no longer the Station Manager at Graceville.

58.     Robarge was never issued any corrective action for his actions against Plaintiff.

59.     Plaintiff has retained the undersigned to represent his interests in this cause and is obligated to pay a fee for these services.  Defendant should be made to pay said fee under the laws referenced above.

## COUNT I
## RACE DISCRIMINATION- DISPARATE TREATMENT

60.     Paragraphs 1-37, 40, 41, 43-46, 48-59 are realleged and incorporated herein by reference.

61.     This is an action against Defendant for discrimination based upon race.

29.     Plaintiff has been the victim of discrimination on the basis of his race in that he was treated differently than similarly situated employees of Defendants who are white and has been subject to disparate treatment on the basis, at least in part, of Plaintiff's race.

30.     Defendant is liable for the differential treatment and hostility towards Plaintiff because it controlled the actions and inactions of the persons making decisions affecting Plaintiff or it knew or should have known of these actions and inactions and failed to take prompt and adequate remedial action or took no action at all to prevent the abuses to Plaintiff. Furthermore, Defendant knowingly condoned and ratified the differential treatment of Plaintiff as more fully set forth above because it allowed the differential treatment and participated in same.

31.     The discrimination complained of herein affected a term, condition, or privilege of Plaintiff's continued employment with Defendant.  The events set forth herein lead, at least in part, to adverse actions against Plaintiff set forth above including without limitation: denial of work and hours at different facilities; denial of hours at the Graceville facility; delays in payment; denial of access to computers to process his paperwork; being secretly followed and falsely evaluated by Robarge; being questioned by a law enforcement officer after being read his Miranda rights in violation of Defendant's policies; being targeted, questioned and overly scrutinized in his work by Robarge; having his requests for leave denied; being falsely accused of being AWOL; being assigned to a facility that was further away than allowed under Defendant's policies; receiving a Letter of Warning and probation; and being removed.

32.     Defendant's conduct and omissions constitutes intentional discrimination and unlawful employment practices based upon race.

33.     As a direct and proximate result of Defendant's conduct described above, Plaintiff has suffered emotional distress, mental pain and suffering, past and future pecuniary losses, inconvenience, bodily injury, mental anguish, loss of enjoyment of life and other non-pecuniary losses, along with lost back and front pay, interest on pay, bonuses, and other benefits.  These damages have occurred in

17

the past, are permanent and continuing.  Plaintiff is entitled to injunctive/equitable relief.

## COUNT II
## RETALIATION

34.     Paragraphs 1-12 and 38-59 are realleged and incorporated herein by reference.

35.     Defendant is an employer as that term is used under the applicable statutes referenced above.

36.     The foregoing allegations establish a cause of action for unlawful retaliation after Plaintiff reported or opposed unlawful employment practices adversely affecting him.

37.     The foregoing unlawful actions by Defendant were purposeful.

38.     Plaintiff voiced opposition to unlawful employment practices during his employment with Defendant and was the victim of retaliation thereafter, as related in part above including without limitation:  denial of work and hours at different facilities; denial of hours at the Graceville facility; delays in payment; denial of access to computers to process his paperwork; having his requests for leave denied; being falsely accused of being AWOL; being assigned to a facility that was further away than allowed under Defendant's policies; and being removed.

18

39.     Plaintiff is a member of a protected class because he reported unlawful employment practices and was the victim of retaliation thereafter.  There is thus a causal connection between the reporting of the unlawful employment practices and the adverse employment action taken thereafter.

40.     As a direct and proximate result of the foregoing unlawful acts and omissions, Plaintiff has suffered mental anguish, emotional distress, expense, loss of benefits, embarrassment, humiliation, damage to reputation, illness, lost wages, loss of capacity for the enjoyment of life, and other tangible and intangible damages. These damages are continuing and are permanent.  Plaintiff is entitled to injunctive relief.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendant for the following:

(a)     that process issue and this Court take jurisdiction over this case;

(b)     that this Court grant equitable relief against Defendant under the applicable counts set forth above, mandating Defendant's obedience to the laws enumerated herein and providing other equitable relief to Plaintiff;

(c)     enter judgment against Defendant and for Plaintiff awarding all legally-available general and compensatory damages and

economic loss to Plaintiff from Defendant for Defendant's violations of law enumerated herein;

(d)     enter judgment against Defendant and for Plaintiff permanently enjoining Defendant from future violations of law enumerated herein;

(e)     enter judgment against Defendant and for Plaintiff awarding Plaintiff attorney's fees and costs;

(f)     award Plaintiff interest where appropriate; and

(g)     grant such other further relief as being just and proper under the circumstances, including but not limited to reinstatement.

<u>**DEMAND FOR TRIAL BY JURY**</u>

Plaintiff hereby demands a trial by jury on all issues herein that are so triable.

Respectfully submitted,


<u>/s/ Marie A. Mattox</u>
Marie A. Mattox [FBN 0739685]
MARIE A. MATTOX, P. A.
203 North Gadsden Street
Tallahassee, FL 32301
Telephone:  (850) 383-4800
Facsimile:   (850) 383-4801

ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and accurate copy of the foregoing has been furnished to all counsel of record by CM/ECF this 13th day of June, 2024.

/s/ Marie A. Mattox
Marie A. Mattox